**PYPER, et v MUTUAL HOME & SAVINGS ASSOCIATION OF DAYTON, OHIO**

Ohio Appeals, 2nd Dist, Montgomery Co

No 1486.  Decided March 7, 1938.

Sidney G. Kusworm, Dayton, R. N. and N. K. Brumbaugh, Dayton, Attorneys for Plaintiffs.

H. P. Williamson, Dayton, Attorney for Mutual Home and Savings Association, Defendant.

## OPINION

**By THE COURT:**

The above entitled cause is now being determined de novo on plaintiffs' appeal on questions of law and fact from a judgment of the Court of Common Pleas of Montgomery County, Ohio. Eighteen persons, all residents of Dayton, Ohio, join in the action as plaintiffs.

The question presented for determination is whether or not a stockholder of the Building and Loan Association had the right to transfer his stock credits, to a deposit account or a certificate of deposit without filing an application for withdrawal of stock credits. The Superintendent of Building and Loans while in charge of the Association under §687-1, GC on the 13th day of February, 1935, disallowed plaintiff's claims for the following reason, "The account was transferred from a stock account to a deposit account after the association went on notice".

On the same day the eighteen plaintiffs

filed their action, the same being finally determined in September, 1937. It was the holding and determination of the trial court that the Superintendent was right in rejecting plaintiffs' claims.

The following statement of facts will render understandable the nature of the controversy and the manner in which the claimed erroneous action arose.

The defendant, The Mutual Home & Savings Association of Dayton, Ohio, was and is a corporation organized and existing under the laws of the state of Ohio, relating to building and loan associations, engaged in their business within the city of Dayton. Prior to 1931 it had come to be a very large institution having assets of more than $31,000,000.00. Under its form of organization deposits were accepted under four classifications as follows: running stock book deposits, certificate of stock deposits, book deposits and certificates of deposit. The income from running stock accounts and certificate of stock accounts was appropriately designated 'dividends' and on book accounts and certificate of deposit accounts the designation was 'interest'. Generally the income by way of dividend was higher than the income by way of interest.

On the start of business January 1st, 1931, the running and paid-up stock accounts totaled $28,022,080.14, while the deposit accounts (book and certificate) amounted to only $736,764.18. Total assets on this date according to the financial statement amounted to $31,191,219.16. Unpaid interest due the Association but not included in the statement of assets, amounted to $182,036.56. The surplus which included the reserve and undivided profits amounted to $1,550,730.15. The net earnings for the year were $1,644,911.82, of which the sum of $83,065.61 was passed to reserve. The number of running and paid-up stock accounts was approximately 28,000.

Among the enumerated powers of a building and loan association, §9651, GC provided for the withdrawal of stock deposits. The pertinent portion of that section reads as follows:

"To permit members to withdraw all or part of their stock deposits, at such times, and upon such terms, as the Constitution and by-laws provide."

The defendant company in §26 of its by-laws made provisions for withdrawals. The pertinent portion of this section reads as follows:

Sec 26. Members and depositors may withdraw all or any part of the money paid on stock subscriptions or deposit accounts at any time provided the money is in the treasury. If sufficient funds are not in the treasury the applications for withdrawal of both stock and deposit accounts shall be filed as received and paid in the order filed as fast as the receipts of the association will pay the same."

It will be noted that the quoted portion of the above section 26 gave no preference to deposit accounts over stock subscriptions. It will also be observed that the provision of the by-law provided for the withdrawal of **money** paid on stock subscriptions or deposit accounts. Prior to 1931 and during 1931 the Association on request made transfers of stock accounts (including running stock and certificates) to deposit accounts or from deposit accounts (book deposits or certificates) to stock accounts. On May 13, 1931, the directors purported to go on notice through the adoption of the following resolution:

"In view of the fact that a shortage of deposits exists in the building association of Dayton and withdrawals being excessively large and burdensome and as a protection to our members and depositors and to our associations,—moved that the association require notice for all withdrawals commencing Wednesday morning, May 13, 1931, (except in emergency cases, twenty-five dollars per week to be paid without notice.)

"All notices to be filed in the order received and paid from the receipts of the association."

No notice was sent out to the association's members or depositors that it had gone on notice pursuant to its by-laws. The Association continued to function after May 13, 1931, by receiving money on running stock, paid up stock and deposit accounts, without advising the customer that the Association was on notice, and this continued until sometime in 1933. It also continued to loan money, the total amount between May 13, 1931 and January 1st, 1932, being $92,919.14. In 1932 it disbursed on loans the total sum of $1,255,241.67. It paid dividends and interest at regular semi-annual periods until July 1st, 1933. According to the December 31, 1931 statement the Association showed net earnings of $1,269,341.96. The total surplus fund including reserve and undivided profits was

$1,415,922.04. Following May 13, 1931, the eighteen plaintiffs had their running stock or certificate of stock accounts transferred to book deposit or certificate of deposit accounts. All these transfers were made during the year 1931, some as early as May and others as late as November. Between May 13, 1931, and September 28, 1933 (the latter date being the time when the Superintendent of Building and Loans ordered liquidation under §687-21, GC), some eighty other accounts were transferred from stock accounts to deposit accounts. The total transfers constituted about 1-3 of one per cent of the total number of stock accounts. The total amount transferred on the basis of par was approximately $325,000.00. Counsel for plaintiff seek to bring the action as a class suit and thereby include all other persons who secured transfers to deposit accounts. This question of claimed class suit we will discuss later.

The only witness called to testify was George W. Kuhns who held the position as auditor and or assistant secretary of the association during all the times referred to in the pleadings and in the evidence. No evidence was presented either in direct or cross-examination as to whether or not the eighteen plaintiffs or any one of them had knowledge that the association had gone on notice. Evidence was introduced through Exhibit 9, set out in tabulated form showing the following data as to each plaintiff: Date of transfer; amount; number of notices of withdrawal on file as of date of transfer; the total amount claimed in such notice of withdrawal; amount of cash on hand as of date of transfer together with the amount of borrowed money. In these tabulations it appears that from the respective dates of transfer that the cash on hand as to five was in excess of the total amount in notices of withdrawal and as to the remaining thirteen the amount claimed on notices of withdrawal was in excess of the cash. This does not take into consideration the $2,225,000.00 loan procured by the Association. The loan in the above amount was authorized under the §9656, GC as then existing. We might further observe that the evidence fails to disclose that either of the plaintiffs had any knowledge of either the notice of withdrawals or the number so filed.

On July 1st, 1931, the association discontinued paying the withdrawals that were on notice and in the order filed, but did continue indiscriminately and even without notice to pay small amounts on divers claims the number being about a thousand per week and in addition other claims to favorite claimants, all of which amounted to a considerable sum but the exact amount is not stated. Again, it appears that the cash balance from time to time was also affected by the distribution of cash on loans which continued until sometime in 1933.

On September 28, 1933, the Superintendent of Building and Loan Associations of Ohio ordered liquidation under the provisions of §687-21, GC. On February 6, 1934, the Superintendent took possession of the association, acting under the provisions of §687-1, GC. During the year the Superintendent gave notice directing all claimants to file proof of claims. Of course this notice did not include the holders of running stock or stock certificates. The plaintiffs along with others filed proof of their claim. On Feb. 13, 1935, plaintiff's claims were rejected by the Superintendent on the sole ground that they had been transferred after the association went on notice. On March 9, 1935, further liquidation was returned to the association under the provisions of 697-21. On March 15, 1935, all allowed claims were paid in full. Prior to this, however, the association's loan of 2¼ million had been paid in full. Acting under the orders of the Superintendent the association set aside $425,000.00 the same being ear-marked to take care of the disallowed claims if ordered to be paid. This amount still stands for the designated purpose. On March 11, 1936, the Superintendent returned the association for the resumption of business on a restricted basis under the provisions of §687-23, GC. As a result of this order the Superintendent has relinquished his administration of the association except as his general authority extends through examinations made from time to time of this and all other building and loan associations within the state of Ohio. Of course the resumption of business is on a restricted basis as stipulated in the order. As to what the present status of the association is we are not advised except it was disclosed from the testimony of the auditor that in the summer of 1937 the cash on hand over and above the segregated amount was over $1,000,000.00.

The answer through its denial of an allegation of the petition raised the issue of the solvency of the association at the time of the transfer in 1931. At the time of bringing the action the deposit creditors and others had not been paid. Following the payment of all claims plaintiffs filed a supplemental petition. In support of the

plaintiffs' claim of solvency the semi-annual financial statements were introduced in evidence covering the years 1931, 1932 and 1933. Defendants presented no evidence whatever on the question of solvency. Competent evidence being introduced as to solvency and no contradictory evidence being presented we have no alternative but to find that the institution was solvent.

We now approach the remaining question as to whether or not this solvent Building and Loan Association had the right to transfer stock accounts to deposit accounts after the association was on notice. As heretofore stated transfers of this character were regularly made before the Association went on notice.

A query arises as to whether or not transfers from stock account to deposit account are to be distinguished from withdrawals. A building and loan association, like other corporations, have such powers as are conferred upon them by law. Within the classification of powers are not only those directly conferred, but are also included apparent powers.

This is necessarily so since it is impracticable to set out in full detail each and every function to be exercised by a corporation. There are certain functions that we speak of as presumptive and incidental and all are again classified under the general term 'apparent'. The powers granted to building and loan associations under the Code prior to recent amendments were very broad.

The recent amendments are not applicable since they became effective subsequent to the transfers made in the instant case. §9651, GC grants the powers to building and loan associations to permit members to withdraw all or part of their stock deposits at such times and on such terms as the Constitution and by-laws provide.

Sec 9652, GC, grants to building and loan associations the power to permit withdrawals of deposits upon such terms and conditions as the association provides.

An examination of these two sections will disclose that the statute makes no distinction between stock accounts and deposit accounts, but leaves the matter entirely in the control of the building and loan associations through their by-laws.

The defendant Building & Loan Association in the instant case likewise made no distinction between stock accounts and deposit accounts. Section 26 of the By-laws provided for the withdrawal of money paid on stock subscriptions or deposit accounts at any time provided the money was in the treasury. No attempt anywhere is made in the By-laws to distinguish between stock accounts and deposit accounts. The only limitation under the provision of the By-law was that money could not be withdrawn if the money was not in the treasury. This provision would be obvious even in the absence of such provision in the By-law. In the instant case eighteen plaintiffs did not withdraw any money and hence it is claimed that the provision that money should be in the treasury would not be applicable. No provision being made for transfer from one account to the other under the Code, and no reference thereto being made in the By-laws, we are confronted with the question as to whether or not such transfers could be made at any time. If transfers of this character could not be made before the Association was on notice, of course then it naturally follows that they could not be made afterwards. Also we must consider the reverse of the proposition, if transfers could have been made before the Association was on notice, could they be made afterwards? Considering that under the By-laws enacted in conformity to the Code provisions the rights of members and depositors being the same, we see no reason why it would not be within the apparent authority of the Association to make transfers from stock accounts to deposit accounts or vice versa. A situation might arise whereby this right could be withdrawn under operation of law. For instance, if the building and loan association became insolvent the rights of depositors would become superior to those of members. Depositors could then assert their rights as creditors. Members or stockholders as owners of the association would be held to a double liability. Hence we think it would be correct to say that transfers made of stock accounts to deposit accounts after insolvency might be set aside to take care of depositor or creditors.

In the instant case we have no showing of insolvency. On the contrary the pleadings and evidence disclose that all creditors have been paid in full, with the exception of claimants whose stock accounts were transferred to deposit accounts following the Association going on notice. Included in the payments were borrowed money and all depositors who made proofs of claim.

Going on notice is not equivalent to in-

solvency. Neither would the fact that the institution borrowed 2¼ millions of dollars be the equivalent of insolvency.

Under §9656, GC, a building and loan association has the right to borrow not exceeding 20% of i·s assets. Following this provision of the Code the Association would have been authorized, had it cared so ·to do,.to have borrowed more than six million dollars.

It is not unusual for financial institutions to borrow. money. Whenever withdrawals exceed deposits plus interest payments and loans retired, the exigency of borrowing is 1tequently followed. Of course, if permanent loans are made as distinguished from temporary, the capital structure is eventually impaired. · On the basis of the financial statement the 2¼ million dollar loan was warranted. The institution making the loan evidently relied on the soundness of the Association since no security was required.

It is the contention of counsel for the Association ·hac the legal effect of the Association going on notice was to deprive stock accounts being transferred to deposit accounts without first filing an application for withdrawal and taking their turn. When that time arrived then they might instead ·of withdrawing the money surrender their stock account and receive a deposit account. The claim is made that this would be the mechanics required even though the owner of the stock account might not want to withdraw his money but would in fact desire just what he got, namely, a deposit account.

The Association at the time the transfers were made proceeded upon the theory that they were acting within the apparent scope of their authority, although this same Associa'ion. is now seeking to rescind its former action. Contra the above proposition counsel for plaintiffs urge that such transfers violated no law or regulation of the Association, did not withdraw any money and was within the power and apparent authori·y of the Association as a going concern. Much may be said on both sides of this controverted question. We do not find it necessary to found our conclusion on this sole question.

The record presents other facts which we think require a finding in favor of the plaintiffs. W have here·ofore referred to them and briefly will do so again. The record fails to disclose that either of the plaintiffs had any notice or any knowledge that the Association was on notice or that the transfer of their accounts was being made ahead of any other claimants who had filed notice. We think this comes squarely within the principle announced in the case of Pugh v City & Suburban Building Association and Loan Company, 1 N.P., 253. This was a decision by the Superior Court of Cincinnati, the opinion being concured in by Jackson, Smith and Smith, Jr. In the reported case the claimant did know the association was on notice but the record failed to disclose that he knew that others on notice were ahead of him. The Association issued its warrant but instead of paying the same in cash gave its note. The second paragraph of the syllabus reads as follows:

"That the action of the association in thus satisfying the claim of P in advance of unsatisfied prior obligations for withdrawal was not ultra vircs for the reason that it was in violation of a By-law only, and not of the fundamental powers of the association; and that in the absence of proof of knowledge on the part of P or her agent that she was being paid out of order, she was not chargeable with conctruc:ive knowledge that such was the fact."

It may be urged that we should not accept as a precedent a decision of a lower court and we might hesitate but for the fact that the case was carried to the Supreme Court and there affirmed without report in 68 Oh St 739. We have given this case very. careful study and it is our conclusion that the affirmance was necessarily an adoption of the principle set out in the syllabus above quoted. We therefore find in favor of the eighteen plaintiffs and judgment is awarded for the amount claimed by each plus interest.

We now come to the question as to whether or no· plaintiffs' action was properly brought as a class suit in favor of other claimants, some eighty in number, whose claims were disallowed for the reason that the transfer of their stock to deposit accounts was made after the Association was on notice. This procedure is purely a creature of statute being unknown to the common law. §11257, GC, is controlling:

"11257.—**One or more can sue or defend for all.** When the question is one of common or general interest to many persons or the parties are very numerous and it is impractical to bring them all before the

court, one or more may sue for the benefit of all."

The action in the instant case named as defendants the Superintendent of Building and Loan Associations of Ohio and The Mutual Home and Savings Association. The original petition was filed February 13, 1935, and an amended petition April 4, 1935. On March 17, 1936, plaintiffs filed a supplemental petition. At the time of filing the supplemental petition the Superintendent of Building and Loans had turned back to the Association its further administration under the provisions of §697-23, GC. The Superintendent filed no answer and at the time of trial was not a necessary party. The defendant, The Mutual Home and Savings Association filed answer and the trial proceeded wholly on the issues joined between the plaintiffs and the Association.

Through the action of the Association on order of the Superintendent, setting aside fund and earmarking same to take care of all disallowed accounts, many of the questions raised through the petition and amended petition were eliminated.

Plaintiffs' supplemental petition alleges these changed conditions and in the prayer asks for money judgment.

Money judgment was not prayed for in the original petition or the amended petition.

The defendant Association joined issues on the amended petition and supplemental petition through their answer.

There is serious question as to whether or not the eighteen plaintiffs had the right to join in a single action. However, having proceeded to trial without objection no question is or could be raised at this time. Counsel for defendants strenuously urge that the action should not be termed a class suit so as to bring in the eighty or more claimants whose claims were disallowed on like grounds. We think the action as finally presented was one at law. This may suggest the query as to whether or not it could properly be in our court on question of law and fact. Before the adoption of the new procedural act the Supreme Court definitely decided that a reviewing court might hear nd determine a law action on appeal where no objection was raised to that form of procedure. 83 Oh St 97. The new procedural act will not modify the rule.

No objection was raised in the instant case.

Originally class suits were confined to actions in equity. Later they have been held to apply to actions at law under certain conditions.

Counsel for both sides have submitted numerous citations, both from Ohio and other jurisdictions touching the question of class suits. We have examined each and every one of these cases, but do not deem it necessary to comment on them. In our judgment each claim is separate and distinct and there is no common or general interest. Each claim is founded on his or her separate contract. The only similarity is that each claim was disallowed for the same reason. This is only one of many questions that may be presented. It is our judgment that this is not a class suit.

Judgment accordingly.

BARNES, PJ, HORNBECK and GEIGER, JJ, concur.